IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:23-CV-2146-D |
| VS. | § § | |
| PHILIP VERGES, et al., | § § | |
| Defendants. | § § | |

MEMORANDUM OPINION
AND ORDER

In this securities fraud civil enforcement action brought by plaintiff Securities and Exchange Commission ("SEC"), three of the defendants—Blue Citi LLC ("Blue Citi"), Robert Malin ("Robert"), and Linda Malin ("Linda") (collectively, "defendants")—move to dismiss under Fed. R. Civ. P. 9(b) for failure to plead fraud with particularity and under Rule 12(b)(6) for failure to state a claim on which relief can be granted.  For the reasons that follow, the court denies defendants' motion.

I

According to the SEC's complaint, Robert and Linda, through Blue Citi, played "a key active" role in defendant Philip Verges' ("Verges'") multi-faceted pump-and-dump

scheme[1] carried out from January 2017 to June 2022.[2]

In the first phase of the scheme, Verges obtained control of five penny stock companies: Alternet Systems, Inc. ("ALYI"), Priority Aviation, Inc. ("PJET"), Puration, Inc. ("PURA"), Vaycaychella, Inc. ("VAYK"), and WaterPure International, Inc. ("WPUR"). Verges installed trusted friends as the penny stock companies' CEOs to conceal his control. He then entered into consulting agreements with the penny stock companies, often for a service fee that exceeded the companies' annual revenue. According to the SEC's complaint, the consulting agreements were a "sham"; Verges had direct knowledge of the penny stock companies' finances via his access to their bank accounts and thus knew that the companies conducted no real business and generated little or no revenue. Verges primarily used the consulting agreements to obtain debt instruments in the penny stock companies as purported compensation for his services and reimbursement for expenses. A typical consulting agreement directed the penny stock companies to execute a debt settlement or issue a convertible promissory note to Verges' companies.

In the second phase of Verges' scheme, Verges enlisted accomplices to purchase the

_____

[1]In a pump-and-dump scheme, a stock owner artificially "pumps" the stock's price through promotional or trading activity and then sells his shares at the inflated price. After the stock owner "dumps" his shares, the price and volume of the shares plummet and unsuspecting investors lose money.

[2]In deciding defendants' Rule 12(b)(6) motion, the court construes the SEC's complaint in the light most favorable to it, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in the SEC's favor. *See, e.g.*, *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

penny stock companies' debt instruments that he held.  The SEC alleges that Verges nominated defendant James D. Tilton, Jr. ("Tilton"), Robert, and Linda to purchase the debt instruments and, in turn, to convert the debt to stock at prices far below market value.  Tilton converted Verges' debt instruments into equity using his company, relief defendant JDT Trading, LLC ("JDT"), and Robert and Linda did the same through their company, Blue Citi. The transactions allowed Tilton, Robert, and Linda to amass shares in the five penny stock companies: ALYI, PJET, PURA, VAYK, and WPUR.

The SEC provides an example of such a transaction between Verges and Blue Citi. On February 24, 2021 Verges executed a debt settlement agreement between his company, relief defendant SMEA2Z, LLC ("SMEA2Z"), and penny stock company, ALYI, to accept $400,000 worth of ALYI stock in payment for his consulting services.  Later that day, Verges assigned SMEA2Z's rights in the debt settlement agreement to Blue Citi.  On March 3, 2021 Blue Citi then executed a notice of conversion for 20 million shares of ALYI stock, which ALYI issued the same day.  On March 5, 2021 Blue Citi sold its 20 million shares of ALYI stock to a third party at a substantial profit.  Robert and Verges agreed that Blue Citi would pay Verges a portion of the trading profits, and bank records confirm that Blue Citi paid SMEA2Z (Verges' company) the sum of $12 million, which may have included payment for the assignment and a kickback.

In the third phase of Verges' scheme, Verges made material misrepresentations or omissions to increase the trading volume of penny stocks ALYI, PJET, PURA, VAYK, and WPUR.  According to the SEC's complaint, Verges directed Tilton to prepare disclosure

statements that omitted information regarding certain promissory notes that the penny stock companies issued to Verges, Robert, Linda, and Tilton himself.[3]  For example, Verges directed Tilton to omit on PURA's March 2019 disclosure statement a $350,000 promissory note issued to SMEA2Z.  Verges also prepared and published other promotional material under aliases, including 1,400 online press releases containing false statements.  On April 16, 2021, for example, Verges posted an online press release that related to a transaction between Blue Citi and penny stock company ALYI.  The online post read: "In April 2021, [ALYI] executed multiple business agreements in conjunction with a $1 million investment in Zoomcar, Inc. . . .  To provide the funds for [ALYI's] investment, the company issued a $1 million convertible note with a $0.10 conversion price."  P. Compl. ¶ 46  (internal quotation marks omitted).  In reality, ALYI's convertible note discount price was $0.001, and Blue Citi received stock pursuant to the promissory note at a conversion price of $0.0032—96.8% lower than the price Verges published.  The disclosure statements prepared by Tilton and press releases prepared by Verges successfully increased trading volume.

In the fourth and final phase of Verges' scheme, Verges facilitated transactions among

---

[3]The disclosure statements were issued according to the OTC Markets Group, Inc's ("OTC Markets Group's") Pink Basic Disclosure Guidelines.  The OTC Markets Group issues alternative reporting standards for over-the-counter public market issuers to facilitate compliance with federal securities law.  *See OTC Pink Basic Disclosure Guidelines*, OTC Markets  Group  Inc.  1,  1  (Jan.  1,  2023), https://www.otcmarkets.com/otcapi/company/financial-report/378099/content [https://perma.cc/Y7LZ-BN9P].  The SEC has not reviewed the guidelines, and the OTC Markets Group does not assure that compliance with the Pink Basic Disclosure Guidelines will satisfy an issuer's legal obligations under federal securities law.  *See id.* at n.1.

Tilton, Robert, and Linda and third parties to "dump" their shares into the market. Verges either used an alias to pose as a transfer agent for the penny stock companies or directed the figurehead CEOs—his trusted friends—to issue the third-party transfers. For example, in December 2020 Verges facilitated a transfer between Blue Citi and VAYK's transfer agent using the alias "Tom Faye." Linda also facilitated third-party transfers, corresponding directly with one transfer agent and receiving emails between Blue Citi's attorney and other transfer agents.

The SEC alleges that Robert, Linda, and Blue Citi participated in Verges' scheme since May 2018. During that time, Blue Citi converted over 2.5 billion shares of stock in Verges' companies at an aggregate conversion price of roughly $6 million. The stock's market value at the time of issuance was roughly $47 million (Blue Citi therefore received a $41 million discount—or 87% discount—on Verges' stock over the five-year period). Bank records indicate that Blue Citi made roughly $36 million in trading proceeds from May 2018 to the present; Robert directly received roughly $12 million, and Linda directly received at least $533,750.

The SEC asserts that Robert and Linda, through Blue Citi, engaged in a pump-and-dump scheme to obtain and sell artificially inflated penny stock company shares over a five-year period. The SEC alleges that defendants committed a primary violation of § 10(b) of the Anti-fraud Provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(a) and 10b-5(c) thereunder, and of § 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act") by engaging in a scheme to defraud; that defendants committed

a secondary violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and 10b-5(c) thereunder, and of § 17(a)(1) and (3) of the Securities Act, by aiding and abetting Verges' securities fraud; and that defendants are liable under § 20(a) of the Exchange Act as Blue Citi's "control persons."

Defendants move to dismiss, contending that the SEC's complaint fails to state fraud with particularity and that it fails to state a claim on which relief can be granted. They posit that the complaint neither alleges that defendants committed a deceptive or manipulative act or acted with scienter to incur primary liability, nor alleges that defendants were generally aware of Verges' securities fraud or knowingly rendered substantial assistance to incur secondary liability. And on the basis that the complaint does not allege sufficient facts for a primary violation of federal securities law, defendants maintain that the allegation that Robert and Linda are liable as Blue Citi's "control persons" also fails.

The court is deciding defendants' motion on the briefs, without oral argument.

## II

## A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [the plaintiff's] [] complaint by 'accept[ing] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (second alteration in original) (internal quotation marks omitted) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). To survive a Rule 12(b)(6) motion to dismiss, the

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (alteration omitted) (quoting Rule 8(a)(2)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

B

Because the complaint alleges a fraud claim, plaintiffs must plead the elements of the claim with the heightened particularity required by Rule 9(b). *See, e.g.*, *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F.Supp.2d 910, 914 (N.D. Tex. 1998) (Fitzwater, J.). "Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *aff'd*, 514 Fed. Appx. 513 (5th Cir. 2013). "At a minimum, Rule 9(b) requires allegations of the particulars of time,

- 7 -

place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Turner*, 2011 WL 3606688, at *2 (quoting *Benchmark Elecs.*, 343 F.3d at 724). More colloquially, the plaintiff must plead the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc. ("Williams")*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," "punctilious pleading detail" is not required. *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.) (internal quotation marks omitted) (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990)). "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (citation omitted).

III

The court turns first to the SEC's primary liability claims, which allege that defendants violated § 10(b) of the Exchange Act, Rules 10b-5(a) and (c) thereunder, and § 17(a)(1) and (3) of the Securities Act based on scheme liability. *See, e.g.*, *Lorenzo v. SEC*, 587 U.S. __, 139 S.Ct. 1094, 1101 (2019). Defendants contend that the SEC has not alleged sufficient facts to show that defendants committed a deceptive or manipulative act or acted

with scienter.[4]

A

Section 10(b) of the Exchange Act grants the SEC rulemaking authority to define and thereby prohibit deceptive or manipulative practices. *See* 15 U.S.C. § 78j(b)). As such, Rule 10b-5 makes it unlawful for any person, directly or indirectly, "in connection with the purchase or sale of any security," to (a) "employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]" 17 C.F.R. § 240.10b-5(a)-(c). Rule 10b-5(a) and (c) claims are referred to as "scheme liability" claims because they are based on deceptive *conduct*, while Rule 10b-5(b) claims are based on deceptive *statements* or *omissions*. *See SEC v. Narayan*, 2017 WL 4652063, at *3 (N.D. Tex. Aug. 28, 2017) (Lynn, C.J.) (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011)). Rule 10b-5(a) and (c) scheme liability claims "recognize that because conduct itself can be deceptive, a defendant may incur primary liability for securities fraud without making or using an oral or written statement." *Id.* (internal quotation marks omitted) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008)). The Fifth Circuit has not yet considered the pleading requirements for scheme liability. *See Burback v. Brock*, 2023 WL 4532803, at *7 (5th Cir. July 13, 2023) (per

_____

[4]Defendants maintain in their reply brief that the SEC did not adequately plead a § 17(a)(2) violation; however, the SEC only alleges § 17(a)(1) and (3) violations against defendants.

curiam) (unpublished opinion) (affirming dismissal despite claim that district court failed to account for "scheme liability" because allegations deemed insufficient on other grounds). But district courts in this circuit have followed the Second, Eighth, and Ninth Circuits, which hold that a plaintiff can demonstrate scheme liability under Rule 10b-5(a) and (c) when the scheme encompasses conduct distinct from the misrepresentations or omissions that give rise to Rule 10b-5(b) liability. *See Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *3 (N.D. Tex. Aug. 24, 2023) (Godbey, C.J.); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *22 (S.D. Tex. July 15, 2016) (Rosenthal, J.).

Scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance. *See SEC v. Daifotis*, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011); *SEC v. Lee*, 720 F.Supp.2d 305, 334 (S.D.N.Y. 2010) (holding that liability is appropriate if the defendant has substantially participated in scheme to mislead investors "even if a material misstatement by another person creates the nexus between the scheme and the securities market"). "It is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) (emphasis in original), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041, 1041-42 (9th Cir. 2008). Deceptive conduct that is distinct from a misrepresentation or omission may include "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative

schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company[.]"  *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 235 F.Supp.2d 549, 579 (S.D. Tex. 2002).

Section 17(a) similarly makes it unlawful to (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or property by means of any [material misstatements or omissions]"; or (3) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. § 77q(a)(1)-(3).  Section 17(a) applies to the offer or sale of securities and does not require proof of scienter for subsections (a)(2) and (a)(3), but in other respects is the same as § 10(b) and Rule 10b-5.  *See SEC v. World Tree Fin., LLC*, 43 F.4th 448, 460 (5th Cir. 2022).  Claims arising under § 10(b) and § 17(a) "are often analyzed as one" because of their similarities.  *SEC v. Wilson*, 2022 WL 18275941, at *6 (N.D. Tex. Dec. 28, 2022) (Ray, J.) (internal quotation marks omitted) (quoting *SEC v. Farmer*, 2015 WL 5838897, at *12 (S.D. Tex. Oct. 7, 2015)).

Therefore, to plausibly plead its scheme liability claims under these related provisions, the SEC must allege sufficient facts for the court to draw the reasonable inference that the defendant in question (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter.  *See, e.g.*, *Wilson*, 2022 WL 18275941, at *6.  The "knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are

within the scope of their authority." *SEC v. Winemaster*, 529 F.Supp.3d 880, 924 (N.D. Ill. 2021) (quoting *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004), *aff'd*, 119 Fed. Appx. 300 (2d Cir. 2004)); *see also Stephens*, 2016 WL 3855860, at *19 (declining to impute employee-defendants' scienter to defendant company when amended complaint did not give rise to strong scienter inference as to employees); *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 367 (5th Cir. 2004).

B

Defendants contend that they are entitled to dismissal because the SEC has not plausibly pleaded primary scheme liability by showing that defendants committed a deceptive or manipulative act or acted with scienter. The court will first consider whether the SEC has sufficiently pleaded that defendants engaged in a deceptive or manipulative act for purposes of scheme liability, and will then turn to whether the SEC has adequately pleaded that defendants acted with scienter.

1

Defendants maintain that the SEC's allegations merely demonstrate that defendants engaged in convertible note investing, generated substantial profits, and shared these profits with Verges as compensation for the investment opportunities. The SEC responds that the motion to dismiss standard requires the court to read the facts in the light most favorable to the SEC, the nonmovant plaintiff. The court holds that, under that pleading standard, the complaint adequately alleges that defendants engaged in a deceptive or manipulative pump-and-dump scheme that deceived the market.

- 12 -

The SEC alleges that Robert and Linda, through Blue Citi, executed a "complex series of transactions," "strategically and deceptively timed," "in close coordination with Verges," to capitalize on his efforts to "pump" the value of the penny stock companies' shares.  P. Resp. (ECF No. 36) at 10.  Robert and Verges agreed that Blue Citi would purchase debt instruments in the penny stock companies; that Verges would direct issuances of discounted stock to Blue Citi; and that Robert would pay Verges' companies a portion of the trading proceeds.  The transactions between Verges and Blue Citi concealed Verges' involvement in the pump-and-dump scheme.  Linda directly corresponded with at least one transfer agent and indirectly communicated with other transfer agents through Blue Citi's attorney to facilitate the third-party sales.  Together, Robert and Linda converted 2.5 billion shares of Verges' penny stock companies priced $41 million below market value.  Bank records indicate that Blue Citi received $36 million from "coordinating with Verges" to "dump" the penny stock company shares at strategic times over the course of five years.  Blue Citi paid Verges' companies over $12.5 million in kickbacks.

The SEC cites five cases to demonstrate that these allegations enable the court to draw the reasonable inference that defendants committed a deceptive or manipulative act.  Two cases are from district courts in the Fifth Circuit.  In *Farmer* the defendant argued that, although he funded false advertising efforts, the funding could not be considered an inherently deceptive act because he "did not control the content of the advertisements." *Farmer*, 2015 WL 5838867, at *16.  The court reasoned that the defendant's assertion that he did not control the advertising's content was not credible because he pursued a particular

- 13 -

advertising strategy and spent over $1.3 million of his own funds to implement it: "all evidence indicates that it was [the defendant] who orchestrated the false advertising campaign," even if he "relied on others to write the false media content and purchase ad space." *Id.* The court held that summary judgment was proper because the defendant "played a leading role in every aspect of [the company's] affairs that were pertinent to setting up and executing a pump-and-dump scheme." *Id.* Likewise, in *SEC v. Hopper*, 2006 WL 778640 (S.D. Tex. 2006), the defendant argued that his round-trip trades[5] could not be considered a fraudulent scheme because "round-trip trading is not itself illegal." *Id.* at *10. The court held that the defendant had "inaccurately" characterized the SEC's allegations because the SEC did *not* "allege that round-trip trading violates the securities laws *per se*, nor [did] it seek to impose liability on [the defendant] merely for having engaged in round-trip trades." *Id.* at *11. "Rather, the SEC alleges that the *particular* round-trip trading scheme orchestrated and implemented by [the defendant] was fraudulent and/or deceptive because the trades were massive sham bookkeeping transactions." *Id.* (emphasis added). The court ultimately denied the defendants' motion to dismiss. *Id.* at *17. Defendants argue in reply that, although the SEC fairly alleged scheme liability in these cases, it had not alleged anything "analogous to 'obscuring the misuse of investor money,' covering up a scheme to deceive the market, creating any appearance of [] false substance, deceiving the investing

---

[5]I.e., purchasing and selling shares of the same security over and over again in an attempt to manipulate observers into believing that the security is in higher demand than it actually is.

public about any company's appearance, or taking any steps to cover up any fraud" in this case.  Ds. Reply (ECF No. 42) at 8.

The SEC's allegations are sufficient to enable the court to draw the reasonable inference that defendants committed a deceptive or manipulative act.  Together, Robert and Linda owned and managed Blue Citi, which converted 2.5 billion shares of artificially inflated ALYI, PJET, PURA, VAYK, and WPUR stock.  Blue Citi received a $41 million discount on its promissory note conversions with Verges' penny stock companies and profited roughly $36 million; Robert received directly approximately $12 million; and Linda received directly at least $533,750.  Defendants' success in convertible note investing required them to time strategically their sales of ALYI, PJET, PURA, VAYK, and WPUR stock in coordination with Verges' efforts to inflate the stocks' prices artificially.  The court must accept as true that defendants collaborated with Verges and acted on his advice concerning these investment opportunities: Robert and Linda, through Blue Citi, paid Verges' companies over $12.5 million for the opportunity to participate in this particular scheme.  *See Farmer*, 2015 WL 5838867, at *16 (granting summary judgment on SEC's scheme liability claim when defendant pursued a particular advertising strategy and spent over $1.3 million of his own funds to implement it).

The complaint alleges that Robert, individually, made agreements with Verges to facilitate the debt-for-equity exchanges between Verges' companies and Blue Citi; that Robert's actions had the deceptive purpose and effect of concealing Verges' involvement in the pump-and-dump scheme; that Linda directly corresponded with at least one transfer agent

and indirectly communicated with other transfer agents through Blue Citi's attorney to facilitate the third-party sales; and that Linda's actions also had the deceptive purpose and effect of concealing Verges' involvement in the pump-and-dump scheme and of causing unsuspecting third parties' shares to plummet in value when Blue Citi "dumped" its shares. The SEC also adequately alleges that Blue Citi committed deceptive or manipulative acts because Robert's and Linda's actions can be generally imputed to the corporation. *See UCAR Int'l, Inc.*, 2004 WL 137073, at \*13. According to the complaint, Blue Citi, through Robert and Linda, facilitated the debt-for-equity exchanges with Verges and the transfers with third parties and profited \$36 million for participating in the scheme, which is more than any other Verges nominee combined. Robert's and Linda's actions were distinct from any misrepresentation or omission made by Verges or Tilton. The SEC does not plead that defendants made, or participated in producing or publishing, the disclosure statements prepared by Tilton or press releases prepared by Verges, even though Verges allegedly published false information regarding Blue Citi's transaction with ALYI in April 2021.

Some district courts (albeit outside the Fifth Circuit) have held that participating in a pump-and-dump scheme is a deceptive or manipulative act because the acts propelling the scheme entail deceptive conduct. *See SEC v. DeFrancesco*, 2023 WL 6965051, at \*7 (S.D.N.Y. Oct. 23, 2023) (denying defendants' summary judgment motion on scheme liability because SEC presented evidence that defendants signed a contract, were included on emails requesting review and approval of articles, discussed the articles, and provided a statement included in the articles); *SEC v. Airborne Wireless Network*, 2023 WL 5938527,

at *23 (S.D.N.Y. Sept. 12, 2023) (granting SEC's summary judgment motion on scheme liability for defendants' varying degrees of participation in pump-and-dump scheme); *SEC v. Curshen*, 888 F.Supp.2d 1299, 1307 (S.D. Fla. 2012) (granting SEC's summary judgment motion on scheme liability because SEC presented evidence defendants used public shell corporation; opened brokerage account to facilitate stock manipulation; and directed matching buy and sell order to artificially inflate stock).  This court holds that, accepting the allegations of the SEC's complaint as true, defendants' actions to propel Verges' pump-and-dump scheme were deceptive and manipulative.  Defendants played a "key active role" in Verges pump-and-dump scheme by "dumping" the artificially inflated penny stock at strategic times over a five-year period.  Accordingly, the court concludes that the SEC has pleaded sufficient facts to satisfy the deceptive and manipulative act element of scheme liability.

2

Defendants also maintain that the SEC's allegations do not demonstrate that defendants knew of Verges' misstatements or omissions or knew that Verges was conducting a pump-and-dump scheme.  In particular, defendants say, the complaint does not allege that defendants knew Verges (1) obtained de facto control over the penny stock companies through "figurehead CEOs"; (2) entered into any sham consulting service contracts (or any false agreements whatsoever) with the penny stock companies; (3) directed Tilton to prepare and publish false and misleading OTC Disclosure Statements and Financial Reports; (4) authored and posted any press releases (using aliases or otherwise); or (5) used aliases either

- 17 -

to conceal his true identity and control of the penny stock companies to deal with the companies' transfer agents or to issue press releases.

The SEC responds that defendants' motive to commit securities fraud is established by the fact that Blue Citi received roughly $36 million in trading proceeds from the pump-and-dump scheme and other circumstantial evidence. For example, Robert and Linda were sophisticated, experienced investors. In 2010 a final judgment was entered against Robert for his participation in a fraudulent "front-running scheme," and he was enjoined from future securities law violations and serving as an officer or director of a public company. Linda obtained her law license in New York in 1987. The SEC maintains that, as sophisticated investors, Robert and Linda "undoubtedly knew" that the transactions with Verges were designed to conceal his involvement and offload the penny stock companies' shares at inflated values. Additionally, the SEC contends, the timing and circumstances of the transactions establish that defendants knew of, or recklessly disregarded, the fraudulent scheme. Over a period spanning nearly a half-decade, Robert and Linda, through Blue Citi, received 2.5 billion shares in five penny stock companies at a collective $41 million discount. Defendants then sold the shares at "significantly higher values, resulting in tens of millions of dollars in trading profits—at least $12.5 million of which they kicked back to Verges." P. Resp. (ECF No. 36) at 13. The SEC posits that defendants "must have known, or recklessly disregarded, that these profits were not a product of their savvy investing[.]" *Id.*

Assuming *arguendo* that defendants did not know about certain aspects of Verges' multi-faceted pump-and-dump scheme, the complaint alleges other deceptive conduct by

Verges that defendants knew or recklessly disregarded.  For example,  defendants knew or recklessly disregarded the misleading statements and omissions in the OTC disclosure statements or 1,400 press releases regarding penny stock companies that they were heavily invested in.  The disclosure statements and press releases were strategically timed to "pump" the penny stock companies' share prices so that defendants could then "dump" those shares into the market.

3

Scienter is a necessary element of a primary violation of § 10(b) of the Exchange Act, Rule 10b-5, and § 17(a)(1).  *See Aaron v. SEC*, 446 U.S. 680, 695 (1980).  The SEC can establish scienter by proving that defendants acted intentionally, knowingly, or in a manner that was severely reckless.  *See, e.g.*, *SEC v. Seghers*, 298 Fed. Appx. 319, 333 (5th Cir. 2008) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).  The Fifth Circuit defines severe recklessness as

> those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers[,] which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981) (en banc).

"When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *SEC v. Gilman*, 2019 WL 4743431, at *8 (N.D. Tex. Sept. 26, 2019) (Lindsay, J.) (quoting *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015)).  The

court determines "'whether all of the facts alleged, taken collectively, give rise to a . . . plausible inference of scienter[.]'" *Id.* (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009)).  Alleged facts are sufficient to support an inference of fraudulent intent if they either "(1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate conscious behavior on the part of the defendant."  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996).  Thus circumstantial evidence may be sufficient to establish scienter, but the evidence must be correspondingly greater.  *See, e.g.*, *World Tree Fin., LLC*, 43 F.4th at 464 (quoting *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988)).[6]

4

The SEC's allegations are sufficient to enable the court to draw the reasonable inference that defendants acted with scienter because they had motive and opportunity.

The complaint alleges motive based on the concrete and personal benefits that defendants received directly from their participation in the fraudulent pump-and-dump scheme.  Blue Citi received roughly $36 million in profits; Robert received roughly $12 million in trading proceeds; and Linda received roughly $533,750.00 in trading proceeds.  The SEC does not allege a *general* profit motive, which is insufficient in the Fifth Circuit to

---

[6]The Private Securities Litigation Reform Act's stricter standards for pleading scienter do not apply to the SEC.  *See* 15 U.S.C. § 78u-4(b) ("The provisions of this subsection shall apply in each private action arising under this chapter that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."); *accord SEC v. Kornman*, 391 F.Supp.2d 477, 494 (N.D. Tex. 2005) (Lindsay, J.).

establish scienter.  *See Owens*, 789 F.3d at 539 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002)); *see also Jacobowitz v. Range Res. Corp.*, 596 F.Supp.3d 659, 690 (N.D. Tex. 2022) (Pittman, J.) ("To properly plead motive, plaintiffs must allege facts showing 'concrete benefits that could be realized'" by the fraudulent conduct) (quoting *Mun. Empls.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019)).  The SEC alleges motive on the basis that the trading proceedings were directed to Robert, Linda, and Blue Citi's accounts and that money was used to fund, *inter alia*, Verges and his scheme.  *See Airborne Wireless Network*, 2023 WL 5938527, at *26 (finding scienter satisfied when evidence demonstrated that proceeds from sales of shares were almost all directed to accounts controlled in whole or in part by defendants, and that the money was used to fund real estate purchases and tax liabilities).

The SEC also pleads opportunity to commit securities fraud.  The complaint alleges that the Robert and Linda worked with Verges.  Verges scoured the penny stock market and located the investment opportunities; Verges communicated his financial advice to Robert and Linda; Robert and Linda, through Blue Citi, acted on Verges' advice and profited substantially; and then Robert and Linda, through Blue Citi, paid Verges for providing them with the investment opportunity.  Robert specifically agreed to this business relationship with Verges.  The relationship among Robert, Linda, and Verges, in addition to the other circumstances that allegedly surround the transactions in question, enable the court to draw the reasonable inference that Robert and Linda acted with scienter.

Robert and Linda also worked with Verges over a five-year period.  During that time,

Robert and Linda, through Blue Citi, purchased the penny stock companies' debt from Verges at a steep discount—over the five-year period, defendants paid $41 million below market value.  Robert and Linda, through Blue Citi, then converted the debt to equity and promptly sold 2.5 billion shares from the five penny stock companies.  Linda directly corresponded with at least one transfer agent and indirectly communicated with other transfer agents through Blue Citi's attorney to facilitate the third-party sales of the shares at significantly higher prices.

The SEC provides an example of Robert's and Linda's coordination with Verges.  In February 2021 Verges assigned Blue Citi his rights in ALYI's debt.  One week later, Blue Citi converted the debt into ALYI stock.  And 48 hours later it sold 20 million shares of ALYI stock at a steep profit.  Blue Citi did not hold the shares for appreciation.  The SEC alleges that these sales occurred against the backdrop of Tilton's and Verges' false or misleading promotional materials.  One of the promotional press releases even allegedly included false information regarding an April 2021 transaction between Blue Citi and ALYI.  The SEC's allegations regarding the nature and duration of defendants' relationship with Verges and the timing of defendants' transactions enables the court to draw the reasonable inference that they acted with scienter.

The complaint's allegations regarding Robert's and Linda's sophistication and experience also enable the court to draw the reasonable inference that they acted with scienter.  The SEC previously obtained a final judgment against Robert for his role in a fraudulent front-running scheme: a judgment that enjoined him from future violations of

various federal securities laws and imposed an officer-and-director bar against him.  Linda has also been a licensed New York state attorney since 1987.  "The law is clear that a defendant cannot escape liability" by "'closing his eyes' to what he could see and 'readily understand.'"  *Farmer*, 2015 WL 5838867, at *11 (citing *SEC v. Frank*, 388 F.2d 486, 489 (2d Cir. 1968)).  Considering their concrete financial gains, duration of involvement, prompt third-party sales, and sophistication and experience, the allegations of the amended complaint are sufficient to counter the premise that Robert and Linda were merely "unsuspecting pawns in Verges' fraudulent scheme."

The allegations of the amended complaint are similar to those in *Farmer*.  In *Farmer* the court granted summary judgment on the SEC's § 17(a) claim, concluding that there was no genuine issue of material fact as to scienter.  *See Farmer*, 2015 WL 5838867, at *11.  The court based its conclusion in part on two facts.  The SEC established the defendant's motive to commit securities fraud because he "pocketed at least $4.1 million of the proceeds" from the pump-and-dump scheme and his "culpability [was] confirmed by the duration of his participation."  *Id.*  The court reasoned that "'[i]t would strain credulity to believe that the defendant remained oblivious to all that transpired around him during that period'" when the defendant "was heavily involved in the scheme from its inception . . . until the worthless stock was dumped on the public market over a year later."  *Id.* (quoting *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 865 (S.D.N.Y. 1997) (finding defendant's culpability confirmed by three-year duration of his participation in various financial manipulations)).  In the present case, the complaint's allegations enable the court to draw the reasonable inference that

- 23 -

defendants pocketed greatly from their participation in a scheme that lasted over five years—a period much longer than the one-year participation period that confirmed culpability in *Farmer*. *See id.*

In another materially similar case, a district court held that the complaint's allegations "more than suffice[d] to establish a strong inference of fraudulent intent" when it asserted that the defendants sold unrestricted stocks for at least $1 million in proceeds and "had the resources to scour the niche market of Penny Stock Companies for aged debt, purchase that debt at a discount, retain attorneys to opine that the debt was a security eligible for conversion to unrestricted Penny Stock Company shares, and sell the securities promptly on the market." *SEC v. Garber*, 959 F.Supp.2d 374, 379 (S.D.N.Y. 2013). Robert and Linda, through Blue Citi, directly profited from their participation; they had the resources to pay Verges $12.5 million to scour the niche market of penny stock companies for aged debt and advise them; they purchased the debt for $41 million below market value; they converted the security into unrestricted penny stock company shares and used an attorney to facilitate third-party transfers; and they sold the securities promptly on the market. Robert and Linda's promptness is illustrated by the SEC's example of Blue Citi purchasing SMEA2Z's debt, converting it to unrestricted shares of ALYI stock, and selling it to a third party at a substantial profit in under 10 days. Viewing the allegations in the light most favorable to the SEC, the complaint plausibly pleads that Robert and Linda acted with scienter. The complaint also plausibly pleads scienter as to Blue Citi because the inference of scienter as to Robert and Linda, Blue Citi's managers, can be imputed to the company. *See Southland*,

- 24 -

365 F.3d at 367 ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual.") (quoting *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988), *aff'd*, 869 F.2d 175 (2d Cir. 1989)).

Accordingly, the court concludes that the complaint plausibly pleads that Robert, Linda, and Blue Citi acted with scienter.[7]

5

Defendants also maintain that the complaint lacks the particularity required by Rule 9(b) in pleading fraud. Scheme liability claims are subject to Rule 9(b)'s heightened pleading requirements because they sound in fraud. *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). To satisfy Rule 9(b), the SEC must articulate the precise contours of the alleged scheme to defraud, or the specific acts conducted in furtherance of it. *See id.*

The court concludes that the complaint satisfies Rule 9(b) because it contains the "who, what, where, when, and how" allegations generally required in securities fraud cases. *See Williams*, 417 F.3d at 453. The complaint identifies the participants in Verges' fraudulent pump-and-dump scheme as Robert, Linda, Blue Citi, Tilton, and JDT. The complaint also specifies with precision the contours of the fraudulent scheme at issue. It identifies the penny stock companies; identifies the number, conversion price, and market value of the shares Blue Citi converted from the penny stock companies; identifies Verges'

_____

[7]Because the complaint plausibly pleads scienter, it also plausibly pleads that defendants acted negligently, thereby satisfying Securities Act § 17(a)(3).

and Tilton's role to "pump" the stock price and Robert's, Linda's, and Blue Citi's role to "dump" the shares; and it even identifies a February 2021 transaction between Verges and Blue Citi to illustrate the scheme.  The complaint alleges that the scheme occurred between June 2017 and June 2022, and that Blue Citi was first issued shares of Verges' penny stock companies in at least May 2018.  The complaint asserts that the scheme took place in the OTC market.  And the complaint alleges how Robert and Linda, through Blue Citi, propelled Verges' pump-and-dump scheme in transactions like the one that occurred on February 24, 2021, and profited from the scheme.

Accordingly, the court concludes that the complaint satisfies Rule 9(b), and it denies defendant's motion to dismiss the SEC's primary scheme liability claims.

IV

The court turns next to the SEC's secondary liability claims: that defendants violated § 10(b) of the Exchange Act, Rule 10b-5(a) and (c) thereunder, and § 17(a)(1) and (3) of the Securities Act by aiding and abetting securities fraud.  Defendants maintain that the SEC has not alleged sufficient facts to show that they had a general awareness of Verges' violations, or that they knowingly provided substantial assistance to Verges.

A

The SEC must prove three elements for an aiding and abetting claim: "(1) a primary violation of the securities laws; (2) that the aider and abettor had knowledge of this violation and of his or her role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation."  *SEC v. Life Partners*

*Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017).  The Fifth Circuit in *Woodward* stated that "it would 'assume . . . the existence of a securities act violation' by the primary violator, and then determine the second element, whether an alleged aider and abettor had 'general awareness that one's role was part of an overall activity that is improper.'"  *SEC v. Morris*, 2005 WL 2000665, at *8 (S.D. Tex. Aug. 18, 2005) (Rosenthal, J.) (quoting *Woodward v. Metro Bank of Dall.*, 522 F.2d 84, 95 (5th Cir. 1975)).

"General awareness means knowledge which, though it may be adduced from reckless conduct, means actual awareness[.]"  *Id.* (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir. 1988), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989)); *see also SEC v. Brady*, 2006 WL 1310320, at *5 (N.D. Tex. May 12, 2006) (Fitzwater, J.).  Therefore, actual awareness is required "unless there is some special duty of disclosure, or evidence that the assistance to the violator was unusual in character and degree."  *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 255 (5th Cir. 2011) (quoting *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 621 (5th Cir. 1993)).  In those instances, "a reckless standard applies."  *Id.*  Assuming certain prerequisites are met, "recklessness [is] the proper scienter for civil aiding and abetting liability" in the context of securities fraud.  *Id.* A plaintiff can demonstrate severe or reckless behavior through "[a]llegations that an aider or abettor encountered red flags or suspicious events creating reasons for doubt that should have alerted him to the improper conduct of the primary violators[.]" *SEC v. McKnight*, 2023 WL 8000294, at *4 (N.D. Tex. Oct. 17, 2023) (Toliver, J.) (internal quotation marks omitted) (quoting *Morris*, 2005 WL 2000665, at *9), *rec. adopted*, 2023 WL 8097078 (N.D. Tex.

Nov. 21, 2023) (Lindsay, J.).  But "how 'knowing' an abettor must be depends upon how substantial the abettor's assistance is."  *Abell*, 858 F.2d at 1126.

Substantial assistance may be adequately alleged based on facts showing that the defendant's conduct was "a substantial causal factor in the perpetration of the primary party's fraud."  *SEC v. Shapiro*, 2008 WL 819945, at *7 (E.D. Tex. Mar. 25, 2008) (citation omitted).  In other words, "the SEC must demonstrate that the defendant 'in some sort associated himself with the venture, that he participated in it as something that he wished to bring about, and that he sought by his action to make it succeed.'"  *SEC v. Felton*, 2021 WL 2376722, at *12 (N.D. Tex. June 10, 2021) (Fish, J.) (quoting *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012), *cert. denied*, 570 U.S. 918 (2013)).

The court will assume that the SEC has alleged facts that enable the court to reasonably infer that Verges committed a primary violation of the Securities Act, Exchange Act, and related rules because the *Woodward* court adopted this approach and the parties do not dispute this element.[8]  *See Woodward*, 522 F.2d at 94.  The court therefore considers whether the SEC has alleged sufficient facts regarding defendants' general awareness of their role in the overall improper scheme and whether the SEC has alleged sufficient facts regarding defendants' knowing and substantial assistance.  Because the parties' briefs combine elements two and three, the court will analyze them together.

---

[8]Based on the complaint, the court assumes that Verges committed a primary violation of Exchange Act § 10(b), Rule 10-b5(a)-(c), and Securities Act § 17(a)(1)-(3).

B

Defendants posit that the SEC has failed to allege facts demonstrating that they had any general awareness of their role in Verges' securities violations or knowingly or recklessly provided substantial assistance because "the complaint's lack of allegations that the [defendants] had any knowledge of [Verges'] misstatements/omissions and/or pump-and-dump scheme is fatal" to the SEC's aiding and abetting claim.

The SEC responds that the complaint alleges that defendants executed transactions with Verges that were designed to conceal his involvement and mislead investors. For a half-decade, Robert and Linda, through Blue Citi, purchased Verges' debt instruments in the same five penny stock companies; converted the debt to equity and then quickly offloaded their shares into the market at a substantial profit; and paid Verges millions of dollars for the investment opportunities. Moreover, Robert and Linda, as sophisticated investors, either knew or recklessly disregarded the misleading statements and omissions in the OTC disclosures and the 1,400 press releases regarding the penny stock companies in which they heavily invested. Robert and Linda also knew or recklessly disregarded that these promotional materials were "strategically timed and coordinated" to inflate the penny stock companies' shares artificially before Robert and Linda, through Blue Citi, dumped the shares into the market.

The court concludes that the SEC has sufficiently pleaded facts that demonstrate, or from which it can be reasonably inferred, that defendants had a general awareness that their role was part of an overall activity that was improper. The complaint alleges that Robert and

Linda were sophisticated investors: the SEC previously obtained a final judgment against Robert for his role in a fraudulent front-running scheme, which enjoined him from future violations of various federal securities laws and imposed an officer-and-director bar against him, and Linda is a licensed attorney in New York. The complaint enables the court to draw the reasonable inference that, because of their sophistication and experience, Robert and Linda, at a minimum, acted with extreme recklessness by assuming, without confirming, that the transactions executed in coordination with Verges were legitimate despite the "red flags." For example, (1) the investment opportunities Verges provided Robert and Linda involved the same five penny stock companies over a five-year period; (2) Verges provided Robert and Linda with steep discounts to purchase the debt instruments he held; (3) shortly after Robert and Linda purchased and converted Verges' debt instruments into equity, OTC disclosure statements or press releases were published regarding the very same penny stock companies that Robert and Linda had recently invested in; (4) Robert and Linda then sold the shares promptly at a significant profit margin; (5) a press release inaccurately reported on the conversion rate in a transaction between Blue Citi and ALYI; and (6) by purchasing and converting Verges' debt instruments, Robert and Linda concealed Verges' involvement in the transactions. The court can draw the reasonable inference that red flags and suspicious circumstances surrounding the transactions created reasons for doubt that sophisticated and experienced investors, like Robert and Linda, overlooked.

The court also concludes that the SEC has sufficiently pleaded facts that demonstrate, or from which the court can reasonably infer, that defendants knowingly or recklessly

provided substantial assistance.  The complaint alleges that Robert and Linda, through Blue Citi, (1) agreed with Verges to buy his debt instruments in the penny stock companies and therefore conceal his involvement in "dumping" the stocks; (2) converted Verges' debt instruments and sold roughly 2.5 billion shares of stock in Verges' penny stock companies; (3) profited more than any other nominee in Verges' scheme combined; (4) and worked with Verges for a five-year period.

The court concludes that, taken as true, these allegations are sufficient under Rule 9(b) and 12(b)(6) to support the SEC's claim that defendants had a general awareness that their role was part of an overall activity that was improper and knowingly or recklessly provided substantial assistance to Verges in the commission of the primary violation.  Accordingly, the court denies defendants' motion to dismiss regarding the SEC's secondary liability claims.

V

The court turns last to the SEC's claim alleging that Robert and Linda are jointly and severally liable as control persons under § 20(a) of the Exchange Act.  Defendants' sole contention regarding control person liability is that the § 20(a) claim must be dismissed because the SEC has failed to plausibly plead a primary scheme liability violation under § 10(b) of the Exchange Act and Rule 10-b5.

A

"Under [§] 20(a), a person who exerts control over a person who violates any provision of the [Exchange Act] can be held jointly and severally liable with the primary

- 31 -

actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 n.4 (5th Cir. 2009). "In determining whether a plaintiff has made a *prima facie* showing of 'control,' it is well-established that a plaintiff must plead facts indicating that the defendant 'had the requisite power to directly or indirectly control or influence corporate policy.'" *Kunzweiler v. Zero.Net, Inc*., 2002 WL 1461732, at *13 (N.D. Tex. July 3, 2002) (Solis, J.) (quoting *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981)). District courts in the Fifth Circuit continue to "apply a 'relaxed' and 'lenient' pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control person liability." *In re SolarWinds Corp. Sec. Litig.*, 595 F.Supp.3d 573, 593 (W.D. Tex. 2022) (quoting *One Longhorn Land I, L.P. v. FF Arabian, LLC*, 2015 WL 7432360, at *2 (E.D. Tex. Nov. 23, 2015)). A plaintiff need not allege that the controlling person actually participated in the underlying primary violation, *see G.A. Thompson & Co.*, 636 F.2d at 958, but the plaintiff must allege some facts beyond a defendant's position or title, *see Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509-10 (5th Cir. 1990). Section 20(a) claims are *not* subject to the heightened pleading requirements of Rule 9(b), so once the SEC has pleaded a primary violation with sufficient particularity, it need only provide the defendants' fair notice of the controlling person claim and the basis of the allegations. *See Abbott*, 2 F.3d at 620.

B

The SEC has pleaded primary violations of securities law. *See supra* § III(B). The complaint also alleges that Robert and Linda served as managing members of Blue Citi

during the relevant period.  In particular, the complaint asserts that, as a managing member, Robert agreed with Verges that Blue Citi would obtain interests in Verges' companies debt instruments with the penny stock companies.  Robert and Linda, together, used Blue Citi to exercise its conversion rights in the debt purchased from Verges' companies, and to enter into stock purchase agreements to sell its shares to third parties, who, in turn, sold the shares in the OTC markets using domestic and offshore brokers.  Robert and Linda also "executed notes, agreements, and conversion notices in their capacities as 'managers' of Blue Citi to obtain the penny stock companies' shares."  P. Compl. (ECF No. 1) at ¶ 31.  And Linda was included on multiple emails that Blue Citi's attorney sent to the penny stock companies' transfer agents to receive their stock.

Accepting the allegations as true and viewing them in the SEC's favor, the complaint plausibly pleads that Robert and Linda had the ability to control Blue Citi's transactions with Verges' companies and other third parties.  Defendants do not offer any argument to the contrary.  The court concludes that the SEC plausibly pleaded a primary violation and controlling person liability.  Accordingly, the court denies defendants' motion to dismiss the SEC's § 20(a) claim.

- 33 -

*   *   *

For the reasons explained, the court denies defendants' November 27, 2023 motion to dismiss.

**SO ORDERED**.

February 9, 2024.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE